# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

YOLINDA LANDRUM,

        Plaintiff,

v.                                          No. CIV 04-1032 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Yolinda Landrum ("Landrum") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Landrum was not eligible for supplemental security income ("SSI"). Landrum moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. Nos. 15, 16.]

Landrum was born on April 13, 1963 and was 39 years old when the administrative hearing was held. [Tr. at 57, 278.] She has an eleventh grade education. [Tr. at 71.] Landrum has no past relevant work experience.[Tr. at 20-29.] She lives alone, has no children, and has worked only brief periods of time. Her income is derived from general assistance and food stamps. [Tr. at 69, 278.]

In April 2001, Landrum applied for SSI. [Tr. at 56-58.] She alleged an onset date of January 1, 1999. [Tr. at 57.] Landrum alleges that she has been unable to work since 1989 due to lupus,

depression, stress, skin cancer[1] and alcoholism.  [Tr. at 21.]  She was diagnosed with systemic lupus erythematosus (SLE)[2] at age 17.  Landrum suffers from flare-ups of SLE, including pain, swelling and large, open lesions, and she has obvious scarring from lupus both on her face and arms.  [Tr. at 217, 246, 259, 260, 267.]

Landrum began drinking at about the time she was diagnosed with lupus.  She has suffered from both drinking problems and using crack cocaine.  From about 1992 until 1997, Landrum was incarcerated for crack cocaine trafficking.  [Tr. at 22.]  She was incarcerated again in 1999 for a period of six months due to a parole violation.  At the time of the ALJ hearing, Landrum alleged that she either was not drinking or drinking very little.

Landrum's application for SSI was denied at the initial and reconsideration stages, and she sought timely review from the ALJ.  An administrative hearing was held on January 17, 2003 in Roswell, New Mexico.  ALJ Gerald Cole left the record open so as to receive additional medical records and to have Landrum undergo a medical consultative exam.  In a decision, dated October 1, 2003, Judge Cole found that Landrum was not disabled within the meaning of the Social Security Act ("the Act") and denied the benefit request.  Landrum challenged this determination to the Appeals Council which denied her request for review on August 26, 2004.  [Tr. at 5.]  This appeal followed.

---

[1]As noted by the ALJ in this case, there is no diagnosis of skin cancer for Landrum.  Instead, she suffers from a skin condition – lupus or SLE.

[2]SLE is described as a generalized connective tissue disorder, ranging from mild to fulminating, and characterized by skin eruptions similar to those seen in discoid lupus erythematosus.  Discoid erythematosus is a chronic, superficial inflammation of the skin, marked by red macules and covered with scanty adherent scales that leave scars.  Dorland's Illustrated Medical Dictionary (26th ed), p. 760.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the

capable of performing other work.[10]  If the Commissioner proves other work exists which the

claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that

work.[11]  Here, Judge Cole made his determination of non-disability at step five.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by

substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v.

Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than

a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th

Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the

Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d

1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole

contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for

purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

---

national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After carefully and thoroughly reviewing Landrum's medical records, symptoms and testimony, the ALJ rejected Landrum's claim for benefits at step five, concluding that jobs existed in significant numbers in the national economy that Landrum could perform.  Judge Cole relied on testimony from a vocational expert who testified at the hearing, and Judge Cole used the grids as a framework in reaching his determination.  [Tr. at 20-29.]  In reaching this decision, the ALJ made the following findings: (1) Landrum had not engaged in substantial gainful activity since her alleged onset of disability; (2) Landrum had an impairment or combination of impairments considered "severe"; (3) the severe impairments did not meet or medically equal any of the listed impairments; (4) Landrum's allegations regarding her limitations were not totally credible; (5) Judge Cole carefully considered all of the medical opinions in the record regarding the severity of Landrum's impairments; (6) Landrum had the RFC for light exertional level work, which involved no more than simple, repetitive tasks and no extensive interaction with the public, co-workers, or supervisors; (7) Landrum had no past relevant work; (8) Landrum was a "younger individual" and had a "limited education" as defined by the SSA; (9) Landrum had the RFC to perform a significant range of light work; (10) although her exertional limitations did not allow her to perform the full range of light work, using the grids as a framework for decision-making, there were a significant number of jobs in the national economy that Landrum was able to perform; and (11) Landrum was not under a "disability" as defined by the SSA at any time through the date of the ALJ's decision.  [Tr. at 28-29.]

5

In this appeal, Landrum argues that the ALJ's RFC findings, with respect to mental and physical impairments, were not supported by the evidence. More specifically, she claims that the ALJ failed to include Landrum's specific limitations in the hypothetical questions to the VE, and that there was not substantial evidence for the ALJ's finding that Landrum could perform the physical requirements of light work. The Commissioner claims that its findings of non-disability were within the purview of the SSA and consistent with regulatory criteria.

<u>**Summary of Landrum's History and Medical Care**</u>

Landrum's medical records begin in 1999, when she was incarcerated. New Mexico Department of Correction medical forms indicate that in 1999 Landrum was an occasional user of crack cocaine and marijuana. She had been a heroin user nine years prior, and her longest period of abstinence from drugs (apparently while in prison) was from 1992-1997. In early 1999, Landrum was drinking daily. She felt unhappy, irritable and was not sleeping well. A March 9, 1999 medical record shows that Landrum had been a drinker for nearly 20 years. One record notes that Landrum had lupus scars on her arms and face. [Tr. at 119-23.] Landrum indicated that she was unable to work as of January 1, 1999, although she conceded in the ALJ hearing that she did not know why she selected that particular date.[12] [Tr. at 21.]

There were no medical records for the year 2000. In April 2001, Landrum applied for SSI. [Tr. at 57.] In her disability report, Landrum stated that lupus, depression, stress, skin cancer (although there was no diagnosis of cancer in the objective medical record), and alcoholism prevented her from working. [Tr. at 65.] Her bones ached from the lupus. Landrum alleged that she was

---

[12]The Commissioner observes that Title XVI benefits are not payable for the period prior to the filing date of the benefits application. Thus, the adjudicated period in Landrum's case begins on April 14, 2001 and ends on October 1, 2003, the date of the ALJ's determination.

unable to work because of these conditions since 1989.  At one point, Landrum worked for one month but said she had to stop because she could not stand up and her bones ached.  [Tr. at 64.]  As of June 2001, Landrum was taking Zoloft for depression and Prednisone.  [Tr. at 63.]

### 2001 Medical and Disability-Related Records

During her interview, a disability examiner wrote that Landrum had trouble concentrating and talking.  Her face was covered with pink fleshy-looking scars.  She also had scars on her arms and was self-conscious about her appearance.  [Tr. at 76-77.]  Landrum alleged that she was depressed because of her physical condition and complained of fatigue and pain in all of her joints.  She did not have any medical insurance coverage and had not been able to see a doctor.  [Tr. at 77.]

On August 14, 2001, Landrum was seen at Mental Health Resources for an outpatient clinical assessment.  She complained of depression and alcoholism and wished to stop drinking.  She had referred herself for counseling and reported a long history of substance abuse and depression.  Landrum explained that the main source of her depression stemmed from lupus scars on her face and arms.  She also reported she had been sexually abused as a child but did not want to discuss it.  Landrum had a history of both suicide and homicide ideation.  She was referred to Dr. Granada for psychiatric care.  [Tr. at 165-170.]

On Landrum's daily activities questionnaire, she stated that she needed to rest for five hours after doing something.  She could walk three blocks every day but could not climb stairs.  She could attend to her daily needs but had trouble being around people.  Landrum tended "to go off on others." [Tr. at 78.]

On September 5, 2001, Dr. Granada saw Landrum and noted that Landrum had had at least two comprehensive exams there.  She had been treated before but always "dropped out" before her

treatment was completed.  Dr. Granada's notes indicate that Landrum was alcohol dependent.  [Tr. at 180.]

On September 24, 2001, Landrum's sister filled out a third-party questionnaire, in which she stated that on a typical day, Landrum cleaned house and visited people.  She did not know if Landrum had any hobbies or interests.  Landrum was all right in public as long as no one made her angry.  Landrum had no close friends.  She was able to pay her own bills, but needed occasional help.  According to her sister, Landrum acted like she had to have a drink.  [Tr. at 82-84.]

On October 5, 2001, Dr. Granada's office notes indicate that Landrum reported she was doing well.  She was sleeping better and was stabilizing.  [Tr. at 179.]  On November 2, 2001, Landrum did not show up for her appointment with Dr. Granada.  [Tr. at 178.]

On November 28, 2001, Will D. Parsons, PhD, conducted a consultative exam, consisting of a clinical interview and mental status exam.  [Tr. at 129.]  Landrum, an African American, was born in Clovis and lived there all of her life except for 11 months when she lived in Texas.  Her parents had separated earlier in her life.  One of her sisters was killed, and Landrum's father was "gunned down."  Landrum was married once but separated in the same year.  She reported that her husband burned and beat her.  Landrum had been arrested once for shoplifting, once for drug dealing and once for assaulting other kids.  She said that she was in the penitentiary for nine years and had served five years in Grants for dealing crack cocaine.

Landrum reported that she started using alcohol and marijuana when she was about age 15.  She began using crack when she was 20 years old.  Landrum denied using heroin[13] but had used

---

[13]As appropriately noted by the ALJ, Landrum's allegations regarding which drugs she had used were inconsistent at times, as well as her allegations of how much alcohol she was drinking at any given period.  Her statement denying use of heroin conflicts with the 1999 penitentiary medical records.

methamphetamines on a fairly regular basis.  Since being released from prison in 1999, she had used marijuana and crack.  Parson's notes indicate that Landrum had been diagnosed with lupus and had prominent discolorations on her face.  Due to lack of financial resources, Landrum had not had any significant medical treatment for the lesions.

Landrum recounted that she had worked at a nursing home as a teenager and a restaurant but not for long.[14]  She worked as a meat trimmer at Excel for one month but she became ill then "from her kidneys."  Her mother died at home from conditions related to alcohol abuse.  Landrum attempted suicide in the 1990's when she was much younger.  She was sexually assaulted at age 15.

Parsons concluded that Landrum was very much in need of treatment for her lupus.  He believed that Landrum probably could respond to short, simple instructions at work but not detailed or complex instructions.  Her attention and concentration were likely impaired because of her physical discomfort and her high levels of distractibility.  Landrum's ability to interact socially were impaired to some degree.  As of this date, Landrum denied drinking or using drugs ("to a problematic extent").  Parson assigned Landrum a GAF of 60.  [Tr. at 129-136.]

Parsons filled out a Disability Services Psychiatric Source Statement of Landrum's ability to perform work-related activities.  He found that Landrum was moderately limited in her ability to deal with detailed or complex instructions.  She was not limited in performing very short, simple instructions.  She was mildly limited in her ability to interact with co-workers; moderately limited in interacting with the public; and, markedly limited in interacting with a supervisor.  Landrum could not manage benefits in her own interest.  [Tr. at 134-35.]

_____

[14]Landrum's allegations about how long she worked in various jobs are somewhat inconsistent.  However, it is clear that Landrum never worked for any extended periods of time.

9

On November 30, 2001, Landrum reported to Dr. Granada that she was doing better with medications and felt relaxed. [Tr. at 177.]

On December 17, 2001, Dr. Scott Walker filled out a Psychiatric Review Technique form. He noted that Landrum suffered from affective and substance addiction disorders. She also had a personality disorder. Dr. Walker found that Landrum was mildly limited in performing daily activities and maintaining social functioning. She was moderately limited in her concentration and persistence. There was insufficient evidence to reach a conclusion about "repeated episodes of decompensation." On the form, Dr. Walker recorded that "EWS notes she appeared to be intoxicated two times when adjudicator spoke with her on phone." [Tr. at 149.] Dr. Walker found that Landrum's report of abstinence was highly questionable. There were inconsistencies in her history. Dr. Walker observed that Landrum's prison records indicated that if she abstained from drugs and alcohol, she was relatively normal. [Tr. at 137-149.]

Dr. Walker also performed a mental RFC Assessment for Listings 12.04 and 12.09. [Tr. at 152.] Landrum was not significantly limited in her ability to understand and remember detailed instructions. There was no evidence that she was limited in her ability to carry out very short and simple instructions. Landrum was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision and to work with others. There were no marked limitations in these areas. But there were marked limitations in Landrum's ability to interact appropriately with the general public and moderate limitations in other areas. Dr. Walker concluded that if Landrum could abstain from alcohol use, she could do certain things. If she was using alcohol or drugs, it was likely that Landrum was unemployable due to her paranoia and anger. Landrum did not appear to meet the disability mental

10

criteria.  If she was using drugs, she likely met 12.09 with drug and alcohol abuse being material.[15] [Tr. at 152-54.]  The ALJ gave weight to Dr. Walker's evaluation.

On December 18, a day after Dr. Walker performed his evaluation, Landrum saw Dr. Granada.  Landrum reported she was doing well although her mood had been somewhat unstable. She was "partially stabilized."  Dr. Granada was increasing some of her medications.  [Tr. at 177.]

**2002 Records**

On January 25, 2002, Landrum reported to Dr. Granada that she was more relaxed and less stressed with the increase her medications.  [Tr. at 176.]  On January 26, 2002, Dr. Susan Roberts in Clovis performed a medical exam after Landrum was referred by Disability Services.  Landrum's lupus was noted on the records.  Landrum had pain, aching and swelling, along with swelling of her eye when the lupus flared.  Landrum reported depression and for that, she was taking Risperdal.  She also had been seeing a counselor.  Landrum stated that depression added to her alcohol use.  She had reduced drinking to 3-4 beers *a week*, but the record later states that Landrum had reduced to 3-4 beers *per day*.  Landrum reported previously drinking a case of beer almost nightly.  While she told Dr. Roberts that she had not been drinking recently, the doctor observed that Landrum smelled like alcohol.  Dr. Roberts noted that Landrum might have Hepatitis C but it was unclear.  Landrum was unable to stand for long periods due to knee and back pain.  Because of depression and alcoholism, Landrum did not feel like doing much.  Her appearance was disheveled, and her speech was slow and

---

[15]A claimant cannot be disabled by substance abuse alone.  The Social Security Administration sent out a teletype applying this rather recent law stating that "[w]hen it is not possible to separate the mental restrictions and limitations imposed by [drug and alcohol abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be  appropriate."  In other words, if the effects of a claimant's mental illness cannot be separated from the effects of substance abuse, the abuse would be found not to be a contributing factor material to the disability determination.  McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir. 2002) (citing SSA's teletype).

11

her affect was flat.  Dr. Roberts concluded that on the physical side, there was nothing to limit her ability to walk, stand or sit.  However, with lupus, she could suffer from joint pain, swelling and stiffness.  Landrum probably could lift 20-30 pounds unless she suffered from a lupus flare-up.  Dr. Robert's biggest concerns about Landrum were her depression and alcohol use.  [Tr. at 158-162.] In his analysis of the evidence, the ALJ gave Dr. Roberts' evaluation some weight but discounted the portions that he considered to be speculative, i.e., that with lupus, Landrum could suffer from joint pain and swelling.

On a disability form dated February 21, 2002, Dr. Finnegan noted that Landrum's condition was non-severe.  [Tr. at 163.]  On February 22, 2002, Landrum reported to Dr. Granada that she was having difficulty sleeping.  [Tr. at 176.]  On February 26, 2002, disability services determined that Landrum was not disabled.  Her primary diagnosis then was substance abuse addiction (alcohol) with a secondary diagnosis of Discoid Lupus.  [Tr. at 38.] The February 27, 2002 notice to Landrum indicated that no evidence supported a finding that Landrum was unable to work.  She also was informed that she could not receive disability payments for alcoholism when she continued to drink. [Tr. at 40.]

On March 15, 2002, Dr. Granada's office notes indicate Landrum was beginning to do better. [Tr. at 175.]  On April 9, 2002, Landrum asked for reconsideration of her disability request.  She stated she was unable to work because of "mental physical disability."  "Cannot work because taking medicine for mental illness."  [Tr. at 44.]  An April 12, 2002 record shows that Landrum was continuing to do well on the medications and had no complaints.  According to Dr. Granada, Landrum was stabilizing.  [Tr. at 175.]  On May 8, 2002, Landrum continued to do well on the medications and had no complaints.  [Tr. at 172.]

Landrum filled out a daily activities questionnaire on June 5, 2002.  [Tr. at 92]  She was able to cook, perform her chores, go to the grocery store and she did not need help in getting places.  She fixed all types of food and ate three meals a day.  Landrum was able to clean and could take walks.  She had no hobbies or friends.  She watched television, sometimes all day long.  She visited with relatives or friends three to four times a week if she was able to get out.  She did some walking and bike riding.  She did not sleep well.  Landrum did not need help with personal grooming.  She took Naproxen for pain.  She was able to concentrate usually but when she felt depressed, she became anxious.  She could lose control with people.  Landrum had never been hospitalized for emotional problems.  She did not think of suicide but later said that "some times" she does.

On June 7, 2002, Landrum saw a doctor, but this medical record is difficult to read.  It appears to document an intake exam for Landrum's lupus.  The note shows that the SLE was stable.  On June 28, 2002, Landrum saw Dr. Ghaffari for SLE.  This notes indicates no depression and no anxiety.  Again, many of these medical records are difficult to read.  [Tr. at 190.]  On July 29, 2002, Dr. Ghaffari wrote SLE, Lupus nephritis, and hepatitis C (positive).  No drug or alcohol abuse was noted although Landrum was smoking.  [Tr. at 188.]

On August 26, 2002, Landrum submitted a request for a disability hearing, stating that she was always hurting and could hardly move around or write a letter "half the time."  [Tr. at 49.]  At this time, Landrum suffered from a flare-up of lupus.  On August 26, 2002, Dr. Ghaffari noted Landrum complained of skin itching and pain in her right upper arm that started two months ago and gradually had worsened until she went to ER.  The record, while difficult to read, appears to state that Landrum denied any joint pain.  [Tr. at 192.]  An August 29 medical record indicates that

13

Landrum was improving but that she refused to go for an eye exam because she had no way to pay for it. [Tr. at 194.]

On September 25, 2002, Landrum again saw the therapist who noted that Landrum was doing well, was stable and was on her medications. On October 2, 2002, Mental Health Resources filled out an annual clinical assessment update form. The reviewer indicated that Landrum had made significant improvements in her psychiatric status. However, the record shows Landrum continued to drink. Her depression had improved. [Tr. at 196.] On October 23, 2002, the therapist noted that Landrum continued to do well on the present medications. [Tr. at 201.]

**2003 Records**

On January 16, 2003, Landrum filled out a disability medical treatment form. She stated that she had bone deterioration and skin problems. She needed to stop "smoking or drinking" and needed to exercise. On this form, Landrum stated that she had worked at a restaurant for 3 months in 1991 and was incarcerated from 1992 to 1997, and was again incarcerated for six months in 1998. She worked at Excel for 2 months in 1999. [Tr. at 110.]

On January 17, 2003, Judge Cole conducted the ALJ hearing for Landrum in Roswell. [Tr. at 274.] Landrum was represented by a non-attorney. Landrum testified that she was not sleeping well because of aching. [Tr. at 279.] On a typical day, Landrum got up about 9 a.m. She spent a lot of time with her sister. She was unable to walk but she could cook for herself. Then she ate and laid down. [Tr. at 280.] She complained of deterioration of the bone on the joint of her upper middle inner leg.

Landrum did not drive and did not have a driver's license. She read some. She testified that she had a problem with drinking and that she drank to help her depression. Presently, Landrum might

14

drink 2 beers every 2 ½ weeks.  When she got out of prison in 1999, she drank a case and a half and then cut back to 2 beers a week about 2 months prior to the hearing.  [Tr. at 285.]  The most serious problem she believed she had that interfered with her ability to work was "deterioration of the bone." which started up about two years ago.  [Tr. at 285-86.]  Her next most serious problem was depression.  She took Risperdal and Zoloft for depression and attended counseling.  [Tr. at 286-87.]  Here next most serious problem was cramping and swelling.  [Tr. at 288.]

Landrum testified that she tried to get jobs at restaurants but they would not hire her because of the way her skin looked.  Her skin irritation caused her constant pain.  [Tr. at 290-92.]  She was able to sit better than she could stand and believed she could only lift a gallon of milk in weight at that time.  [Tr. at 293.]  Landrum was able to stand 15-20 minutes total.  She had problems with her vision becoming blurry.  She said her hands tended to swell up and cramp.  She could walk about five blocks.  She experienced anxiety and nervousness and now had problems with attending to her daily needs as well.  [Tr. at 296-97.]

At the hearing, a VE testified that there was work available for someone who could perform simple job duties that did not require extensive interaction with people.  At the medium exertional level, there were positions of kitchen helper and cleaner.  At the light exertional level, there were positions of laundry folder, laundry assembler, and assembler of printed products.  At the sedentary level, there were positions of assembler of eyeglasses, laminator of leather products and jewel stringer.  [Tr. at 298-302.]  If Landrum could sit no more than 30 minutes at a time, there would not be any sedentary jobs she could perform.  Light duty work would allow some sitting but required mostly standing.  All jobs required frequent to continuous use of both upper arms.  Landrum's representative asked the ALJ to take into consideration Landrum's facial scarring and related possible

15

discrimination against her.  The ALJ decided to order a consultative medical exam before reaching his decision.  [Tr. at 303-04.]

On January 27, 2003, Dr. Granada and Jennifer Allen, a clinical specialist, wrote a letter on behalf of Landrum.  The letter stated that Landrum had been with Mental Health Resources since June 2001 and had received counseling since that date.  Her diagnosis was Mood Disorder due to lupus.  Alcohol dependence was the secondary diagnosis.  Landrum had made significant progress in decreasing alcohol consumption and her alcohol dependence was in remission.  Landrum continued to have depressive episodes which stemmed from the physical effects of lupus.  She was unable to complete daily activities around home because of fatigue and pain.  She was limited in her ability to socialize and, because of her skin condition, was unable to be in the sun.  Landrum was unable to walk or stand for extended periods of time.  Granada and Allen recommended that she not return to work because the emotional and physical stress would cause her symptoms of lupus to flare-up and her depression to worsen.  [Tr. at 205.]

On March 13, 2003, Janice Davis of the Income Support Division of DVR met with Landrum.  Ms. Davis believed Landrum needed extensive medical services before she could benefit in terms of employment assistance.  Davis referred her to La Casa de Buena Salud and Social Security.  She suggested to Landrum that she work on obtaining SSI.  Her notes indicate that Landrum was diagnosed with lupus which was progressive without treatment.  [Tr. at 117.]  The ALJ did not discuss this record in his written determination, but is not required to do so.

As required by the ALJ, Dr. N. Alexander, a pain specialist, saw Landrum on April 18, 2003.  Landrum complained of generalized pain and was suffering from a three-day flare-up of lupus.  She reported that she was unable to get out of bed.  Landrum was not currently drinking but said she

16

drank "little alcohol at present."  She denied drug use.  She was disheveled in appearance.  [Tr. at 207.]

Dr. Alexander filled out a physical assessment for Landrum, but the first page is missing.  He noted exertional limitations of 20 pounds lifting (frequent).  She could stand less than two hours and sit less than six hours.  Landrum had limited ability to push and pull.  With respect to her lupus, the doctor indicated that "once treated, she may be able to do more."  Landrum's balance was limited and her communication speech skills were poor.  Her pain was secondary to lupus but should improve with treatment.  [Tr. at 211-214.]  The ALJ gave only partial weight to Dr. Alexander's opinion because he found the doctor's conclusion to have been based on Landrum's subjective complaints rather than objective evidence.

On May 12, 2003, Dr. Granada noted that Landrum was depressed and stressed.  On August 6, 2003, Landrum saw Dr. Granada, and the record indicate that Landrum had been in the hospital.  Her bones were affected.  She complained of facial swelling.  She was having jerky movements and stiffness which tended to occur when her lupus was active.  [Tr. at 225.]  On August 12, 2003, Landrum was seen by Dr. Sharma at La Casa Family Health Centers.  She complained of pain in her left arm.  The left side of her face was swollen in the mornings.  Landrum had multiple skin ulcers.  [Tr. at 258.]

On September 10, Landrum reported to Dr. Sharma that she rated the pain in her upper left arm was as a 5 out of 5.  [Tr. at 257.]  Landrum complained of sores on her left arm that were open and infected.  She had been in urgent care the day before.  She also had sores on her chest above her breasts.  Her lupus was currently untreated.  On September 11, 2003, Dr. Sharma's office notes indicate lupus and schizophrenia.  Landrum's skin ulcers were healing.  [Tr. at 256.]  In his opinion,

17

the ALJ did not discuss these medical records, but they may not have been provided to the ALJ. They were provided to the Appeals Council.

On September 30, 2003, Jennifer Allen of Mental Health Resources again wrote a letter on behalf of Landrum, this time addressed to ALJ Cole.  Allen stated that Landrum's depression and use of alcohol were a direct result of lupus.  Without proper medical care, the sores from lupus on Landrum's face and arms increased.  Her depression then increased as well causing her to turn to alcohol.  Landrum's sores had remained constantly painful and caused Landrum embarrassment. Landrum had  trouble with fatigue as well.  She spent most of the day in her living room, but was unable to use the air conditioner because the cold bothered her.  She isolated herself because of the sores and her embarrassment about them.  She had little to no family or social support.  Allen attached photos to show that Landrum's sores were neither small nor minor.  In Allen's opinion, Landrum was unable to engage in full-time, long term employment and should be considered disabled. [Tr. at 217.]

On October 1, 2003, Judge Cole issued an unfavorable decision.  He noted that Landrum had submitted three prior requests for disability.  While he found that Landrum suffered from severe impairments, they did not meet a listing.  She retained the RFC for light exertional level work, involving simple, repetitive tasks and no extensive interaction with the public and co-workers or supervisors.  Judge Cole looked carefully at Landrum's allegations of pain but did not find them entirely credible.  He concluded that she could lift 20 pounds occasionally and sit or walk 6 hours or more per day.  Because Landrum had no past relevant work, the burden shifted to the social security administration to show that other jobs existed in significant numbers in the national economy that

Landrum could perform.  In using the grids as a framework, the ALJ concluded that were such jobs, including laundry folder, laundry assembler, and assembler of printed products.  [Tr. at 17-28.]

**Landrum's Records, Post-ALJ Determination**

After the decision was issued, Landrum saw Dr. Sharma on October 20, 2003.  Landrum had multiple skin lesions.  On October 22, 2003, Landrum's annual clinical assessment at Mental Health Resources was completed.  [Tr. at 226.]  She had not improved as much compared to the previous year.  Her psychiatric status improved only mildly over the last year.  She still suffered from depression which coincided with lupus flare-ups.  Her functional status had not improved due to increasing problems related to lupus.  She was unable to work.  She had difficulty completing daily activities; she isolated herself; she was paranoid about being looked at; and she had minimal support.  She had significantly reduced the use and amount of alcohol.  Landrum had remained compliant with medications and appointments.  [Tr. at 226.]

On October 29, Landrum saw a therapist and reported that she felt better.  She was being treated with Prednisone by her primary care doctor.  The pain had reduced markedly and she felt better all over.  The jerky movements and stiffness were reduced.  [Tr. at 225.]  Dr. Sharma saw Landrum on November 12, 2003.  The note indicates her lupus was severe.  She needed a disease modifying agent and rheumatology.  This record again indicates Schizophrenia.  [Tr. at 254.]

In January 2004, Landrum continued to see a counselor but most of these records are very difficult to read.  [Tr. at 247.]  On January 13, 2004, Dr. Sharma saw Landrum who complained of pain.  Landrum had full sores on her chest, face, back and arms that were raw.  Dr. Sharma increased the Prednisone.  [Tr. at 267.]  On January 21, 2004, Landrum saw a therapist.  Her sleep and appetite were erratic.  She had jerky movements and stiffness again.  She could barely get up at times.

19

On March 9, 2004, a radiologist's report notes that Landrum had swelling of the left periorbital area and cellulitis. The CT scan of her brain was negative or normal but she had probable cellulitis. On March 16, Dr. Sharma followed up with Landrum. She had no pain at that time but was still on Prednisone. [Tr. at 266, 273.] On March 25, 2004, Landrum saw Dr. Gillan. Dr. Gillan noted SLE, lupus, alcoholism, depression and Hepatitis C. The record indicates that Landrum was drinking 2-3 beers per week. She was unable to work and reported to Dr. Gillan that she had quit smoking and drinking. She had no pain on this day and was referred to University Hospital, Rheumatology. [Tr. at 265.]

On March 29, 2004, Dr. Sharma again saw Landrum and noted that she was to see a rheumatologist in Albuquerque. She was still on Prednisone. [Tr. at 264.]

On April 15, 2004, there is a Mental Health Resources letter from Cinda Healer, a case manager. Healer had been Landrum's case manager for six months. She stated that Landrum's condition worsened considerably in the past few months. She had been in the hospital about six weeks ago due to an infection caused by lupus. Landrum's face was swollen but she could not afford the antibiotics to treat the infection. The Mental Health Resources Center reported that they had exhausted all possibilities of assistance for Landrum who was collecting only $231/month in General Assistance. Landrum needed treatment for lupus and Hepatitis C, and was scheduled to see a Rheumatologist on April 30. There is no corresponding medical record for that scheduled visit. Healer notes that Dr. Gillan had said Landrum was unable to work.

On May 3, 2004, Dr. Arth saw Landrum. Landrum complained of less itching. Her sores were healing but her face continued to itch. The doctor increased her Zoloft medication. Landrum was to see a specialist on that day. There is no corresponding medical record. On May 6, 2004, Landrum

saw Dr. Gillan for follow up.  The office notes indicate Landrum was drinking 2 beers daily, but the notes are difficult to read.

On June 9, 2004, Dr. Arth saw Landrum.  Her diagnosis was Mood Disorder secondary to lupus.  The doctor increased her prescription of Zoloft again.  Landrum complained of twitching and jaw clenching.  She was to go to Albuquerque the next week for evaluation and possible skin grafts.  Her mood was much improved and she was less anxious.  On June 9, Dr. Sharma also saw Landrum and noted multiple skin ulcers.  The office notes indicate that Landrum was seen at UNM (but no UNM medical records are part of the administrative record).  On June 9, June 16 and June 28, Landrum saw a therapist, but the office notes are difficult to read.

On August 26, 2004, the Appeals Council denied Landrum's request for review.  The records described above, documenting treatment subsequent to the ALJ's decision, were submitted to the Appeals Council as part of its review.

## Analysis

The adjudicated period, April 14, 2001 through October 1, 2003, is unchallenged by Plaintiff.  In addition, Plaintiff does not contest the ALJ's decision that Landrum's impairments did not meet or equal a listing, his findings that Landrum was not entirely credible, or his assignment of weight to the various treating and consultative physicians' opinions.  Moreover, Landrum does not argue that the ALJ failed to adequately develop the record.  Indeed, the ALJ required and obtained an additional consultative exam before he reached a final determination as to Landrum's benefit request.

Plaintiff's primary argument in support of reversal or remand is that the ALJ failed to perform a function-by-function analysis of Landrum's RFC and did not relate his RFC findings to the record.  In other words, Plaintiff alleges that Judge Cole did not assess the "physical demands of the work

activity, including sitting, standing, walking, and lifting . . . ." and did not discuss Landrum's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. Landrum also agues that the ALJ did not include in the hypothetical question to the VE Landrum's specific limitations from a mental standpoint in her ability to function.

### Physical Impairments

With respect to Landrum's alleged physical impairments, there was substantial evidence in the record to support the ALJ's conclusion that she could perform a significant range of light work that involved lifting no more than 20 pounds at a time and frequent lifting or carrying of objects weighing up to 10 pounds.  There was a variety of light work jobs in the national economy that could be performed by someone with Landrum's limitations.

For example, during the adjudicated period, there was evidence in the record that Landrum was able to walk three blocks every day and attend to her daily needs.  She cleaned house and visited people on a typical day.  [Tr. at 82, 165.]

In 2002, Dr. Roberts concluded that there was nothing physical to limit her ability to walk, stand or sit, even though with a flare-up of lupus, Landrum might suffer from joint pain, swelling and/or stiffness.  [Tr. at 161.]  Dr. Roberts concluded that she could lift 20-30 pounds limited only by flare-ups of lupus.  [Tr. at 162.]  As of June 2002, Landrum stated that she was able to cook, do chores, go to the grocery store and that she did not need help getting places.  She fixed all kinds of food, ate three meals a day and was able to clean.  Landrum stated that she did some walking and biking and could climb stairs.  [Tr. at 92-98.]  In August 2002, even with a flare-up of her lupus, Landrum denied having joint pain and seemed to improve according to the doctor's notes. [Tr. at 192, 194.]

In 2003, prior to Judge Cole's decision, Landrum observed that she needed to exercise. [Tr. at 110.]   While she testified at the January 2003 hearing that she could not always walk, she was able to cook for herself.  She also testified that her most serious problem then was deterioration of the bone that had started about two years earlier, yet there is no objective medical evidence to show that her bones had deteriorated.  There are some complaints by Landrum documented in August 2003 medical notes regarding complaints of jerky movements and stiffness, apparently during a time when Landrum's lupus was active.  [Tr. at 225, 228.]

The consulting physician, Dr. Alexander concluded that Landrum could lift or carry 20 pounds occasionally and 10 pounds frequently.  Dr. Alexander further noted that Landrum was "5/5 for motor grip strength, hip flexion, knee flexion and extension, 4/5 for dorsiflexion."  [Tr. at 208.]  However, he also determined that Landrum could only stand or walk for less than two hours per work day and sit for less than 6 hours per work day.  He then stated that once treated for lupus, Landrum might be able to do more.  [Tr. at 211.]  She was currently suffering from a 3-day flare-up.  [Tr. at 207.]  While these conclusions show some limitations of Landrum's work-related abilities, Judge Cole gave only partial weight to Dr. Alexander's opinion that Landrum could not stand or sit for any length of time because he found no objective support for that opinion.  Instead, the ALJ concluded that Dr. Alexander made that finding based on Landrum's subjective complaints that she was unable to sit or stand for any length of time, particularly during a flare-up.

Based on the record evidence, the Court concludes that there was substantial evidence to support the ALJ's conclusion that Landrum was able to perform light duty work.  Moreover, the ALJ properly discounted some of Dr. Alexander's opinions that appeared to be based on Plaintiff's subjective evaluation of her ability to stand or sit, as opposed to objective findings.

**Mental Impairments**

Landrum relies on an unpublished opinion in support of her position that the ALJ failed to include in the hypothetical question to the VE Landrum's moderate limitations in maintaining concentration, persistence or pace. *See* Wiederholt v. Barnhart, 121 Fed. Appx 833, 2005 WL 290082 (10th Cir. Feb. 8, 2005). However, in Wiederholt, the ALJ himself found that the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace in determining that claimant's RFC. but then failed to include that limitation in his question to the VE. The Tenth Circuit determined that the hypothetical presented to the VE did not reflect the claimant's RFC because the ALJ's question did not incorporate the judge's "additional, more specific findings regarding [the claimant's] mental impairments." Therefore, the VE's opinion that the claimant could perform certain work was not substantial evidence to support the ALJ's decision in Wiederholt.

In contrast to the facts in Wiederholt, Judge Cole did not find that Landrum had moderate difficulties in maintaining concentration, persistence or pace in reaching his determination of her RFC. Here, the ALJ "accommodated the claimant's allegation that she does not work well in close proximity to others, in assessing her RFC. However, the medical records show . . . that when she is not using alcohol or illegal drugs, her mental presentation is unremarkable." [Tr. at 26.]

Landrum actually appears to rely on Dr. Walker's findings (under assessment of the "B" criteria) on the Psychiatric Review Technique form, filled out December 17, 2001. Dr. Walker found that as to the "B" criteria for certain listings, Landrum had moderate difficulties in maintaining concentration, persistence or pace. [Tr. at 147.]

The Court agrees with the Commissioner that the use of the Psychiatric Review Technique form (PRTF) does not in itself compel a finding that reversal is warranted. One's limitations as

24

assessed on the PRTF are not synonymous with one's RFC.  Instead, the PRTF and related evaluation are used to determine whether a claimant's impairments meet or equal a listing.  This evaluation examines the nature and extent of a claimant's impairment.  In conducting this evaluation, the reviewer compares the medical findings about the impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listing. 20 C.F.R. § 416.920a(d)(2).

If after conducting this evaluation, a listing is not met, then the RFC is assessed at steps 4 or 5.  The RFC, in contrast to the PRTF, measures what a claimant can do despite the limitations imposed by the impairment.  20 C.F.R. § 416.945(a)(1).  The RFC is the most the claimant can do despite his or her limitations and is based on all the relevant evidence in the claimant's case record.  Id.  Social Security Ruling 96-8p (cited by both parties) expressly states that the PRTF, or the limitations identified as "B" or "C" criteria "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment . . . ." S.S.R. 96-8p.

Here, there was substantial evidence supporting the ALJ's conclusion that Landrum's mental impairments did not prevent her from performing a significant range of light exertional level work which involved no more than simple, repetitive tasks and did not require extensive interaction with the public, co-workers, or supervisors.  In 2001, the medical records indicate that when Landrum received medical treatment for her depression and attended counseling regularly, her depression and mental status improved and stabilized.  [Tr. at 179.]  The Psychiatric Source Statement of Landrum's ability to perform work related activities in 2001 observed that there were no limitations as to her ability to follow short, simple instructions.  She was only mildly limited then in her ability to interact with co-

workers, while moderately limited in interacting with public and markedly limited in her ability to interact with supervisors.  She was not limited at all in her ability to adapt to changes in the workplace.

Also in late 2001, Dr. Parsons observed that Landrum probably could respond to short simple instructions at work, although not complex, detailed instructions. [Tr. at 131.]  Her social interactions were impaired to some degree in his opinion.  Dr. Granada again improvement in Landrum's mental condition in late November 2001.  Moreover, in December 2001, Dr. Walker concluded that based on her prison medical records, Landrum was relatively normal if abstaining from the use of illegal drugs and alcohol.  [Tr. at 149.]  Dr. Walker also opined that Landrum was not significantly limited in her ability to carry out short and simple instructions and to perform activities within a schedule and make simple work-related decisions.  [Tr. at 152.]

In early 2002, Dr. Granada again reported that Landrum stated she was more relaxed and less stressed with the recent increase to her medications.  Landrum began having some problems in February 2002 with her sleep and depression but by March 15, 2002 was starting to do better.  By April 2002, Dr. Granada's office notes show Landrum had no complaints and was stabilizing.  In September 2002, Landrum's therapist indicated that she was continuing to do well and was stable on her medications.  The October 2002 mental health annual review form shows that Landrum's depression had improved and her psychiatric status was significantly improved.  [Tr. at 196.]

In 2003, Landrum appeared to have more problems again with depression but one record shows that she had missed some of her medications.  [Tr. at 233.]  Her lupus also was active at times in 2003 and apparently untreated.

The Court is very sympathetic with Landrum's condition, particularly with respect to her lupus, the scars and discoloration, flare-ups, and other problems caused by the disease.  It is clear that

Landrum's flare-ups, skin lesions, discoloration and scarring are not only painful but embarrassing. Nor is there doubt that Landrum's physical condition may have been a contributing factor, perhaps a significant one, in her substance abuse history. The Court's determination, however, may not be based on the degree of sympathy the Court feels for the claimant, nor can the Court substitute its judgment for that of the fact-finder.

**Conclusion**

The Court concludes that the record as a whole contains substantial evidence to support the Commissioner's decision and that the ALJ applied the correct legal standards. Accordingly, the Court denies Landrum's request to reverse the Commissioner's final decision and/or to remand for a new hearing.

IT IS THEREFORE ORDERED that Plaintiff's motion to reverse or remand [Doc. No. 15] is DENIED and that this case is DISMISSED, with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge